Now move to the next case on the calendar, and that is Moll v. Telesector Resources. Let me just make sure Council is on the line and all wired per sound. So Ms. Greco, excuse me? Yes, Your Honor. Good morning. I don't see you. I hear you, but I don't see you. Now I do. Great. Okay. And Mr. Urban? Good morning, Your Honor. James Urban for Verizon. All right. So Ms. Greco, I understand you reserved two minutes for rebuttal. So that gives you eight minutes out of the gate. You may proceed. Okay. Good morning, Your Honors. I represent Cindy Moll. Our brief sets forth in detail our position, but I would like to point out to the court some salient points. With regard to the hostile work environment, the court found that there was no material, no existence of a material issue of fact regarding the objective basis for a hostile work environment. What the court said specifically was that the plaintiff wasn't physically threatened while the statements to her or that she heard about other female co-workers were plural. They were merely offensive rather than humiliating. The innocence didn't interfere with her work. In this case, Your Honor, the facts looked at in light most favorable to Ms. Moll do not show statements that were childishly silly and trivial. These statements, the things that occurred to her, even just looking at Mr. Irving, her manager, they were, she was relentlessly pursued and sexually fantasized about by her manager. She was forced to be alone with him in order to be able to do her daily work. And she was followed by him outside of work. She felt threatened by him in her work environment. He left her notes, things such as, I was definitely thinking about the possibilities. You look and smell great today, call me. He was suggested she had an affair with two men at work. When she was in and out of town of training and she was alone in her room, he called her incessantly. So she asked him to stop, please stop. She had to take the phone off the hook. And then when she got pregnant and returned from her pregnancy, he kept, he resumed his sexual pursuit of her. He left her a note that said he was, he was taking, when he was waking a shower, he thought about her and she looked good and spelled nice. That statement alone is a man telling an employee, a female employee, that he is sexually fantasizing about her. And when she rebuked him. Are you saying that statement alone would be enough to establish a hostile work environment? I would argue it could, but there's much more in this case, your honor. That statement says to a woman that a man is thinking about her when he's taking a shower. And when you add to that, what he does next, when she rebukes him, he says that she, and she alone, for a period of two years, a period of from June of 2001 to January of 2013, so a year and a half. That she must personally see him whenever she had a work question. The fence argues that, that Irving told others they could, that he was getting too many emails, but there is no testimony, nothing that anyone other than Cindy mall was required to go into his office. She couldn't use the phone to talk, to talk to him. She couldn't send him emails. She had to physically go into that office with him. And she testified that she felt uncomfortable each and every time she had to go into that office with him. And that wasn't just it. In addition to that, he wanted, she told him she would be coming to work early in the morning to finish something like six o'clock in the morning. He called her to come to work at night. They would have been alone. She was afraid to do that. And then he disciplined her and he disciplined her for conduct. He wasn't disciplining men for, he disciplined her for dealing with RFP, which was not her fault. When in fact, two males just walked one way and didn't do their RFP, they took off or a day off and nothing happened to them. He wouldn't allow her to work from home when other men were working from home. He followed her to a lunch meeting and told her he wanted to develop her. This continuing course of conduct was threatening to her. Well, what period of time did this occur? How many months altogether? A long time. About a year and a half? You said about a year and a half or? Well, that actually, before she became pregnant, they made comments, etc. But when she came back from her pregnancy, and that was in late April, early May of 2001. From that all the way up, he followed her in October of 2002. He stopped being her manager in January of 2003. That's when the other followers took over. So I guess it's your point here that there's a subjective and a objective element to this. The subjective I don't think is an issue here, right? It's a question of whether a reasonable jury would conclude based upon these facts that there was a hostile work environment. And under these circumstances, I guess what you're saying is that she was, a reasonable jury could conclude that based upon this, she was felt threatened. I guess it felt that this fellow was after her sexually the whole time and made it uncomfortable. That ultimately, I guess that was a reason why she didn't want to be transferred to Amherst later on because Irving was there. So that could be viewed, I think, as part of the picture. OK, thanks. I just wanted to understand. And Your Honor, defense, I just want to hit a couple of their arguments. Defense said that this is the Byrne case. This is not the Byrne case by any means. First, Irving had no any type of advance or made any statements to Byrne directly to her. So this has nothing to do with what happened with Byrne. This is a completely different set of circumstances, not only with regard to the hostile work environment, but also with regard to the other points that will come forward. The defense made a comment about an argument about secondhand comments. We have deposition testimony, affidavits to support. When you look at the totality of the circumstances, the other things that were going on in the workplace. It's not just Cindy Maul, what happened to her. She also observed what happened to others and heard about it. And the other people testified. Interestingly, Spencer, who is a person that we're using as a comparator, he said in his deposition, when he was questioned about Finnegan using his business telephone, his fax number was 25 Penis. And when the depositions were going on in a different case, just before he testified in a federal court deposition regarding sexual discrimination, he referred to his phone number about as 25 Penis, which is how I learned about it. And question met his deposition. But when I asked Spencer about that in his deposition, what he said is, this is nothing. Things went on all the time. And that was unsolicited. He making a comment of a male in that work environment. When you look, when you take the totality of the circumstances, not just Irving, but everything else also going at the time I set forth in our brief, this environment was a hostile work environment and a reasonable jury could find it objectively. Was there anything in the record to indicate that your client made complaints prior to the EEOC complaint? Uh, she complained to, um, right now I'm just getting a blank on her name to the in-house, uh, um, discrimination office. That's why they did the training. You see the training that they did where he left. That was a result of a complaint. But interestingly, there's no records of any investigation being done. And there was no conclusion about the investigation. And when my client complained that when they did this training, because they said the training was because there were women that had complaints, employees that had complaints, um, Irving laughed. Which my client felt very, very offensive, but which the Verizon, uh, person who headed this said, oh, she laughed when she saw the vignettes too. Uh, my client didn't find it funny. She had made complaints. She was a victim of harassment, discrimination. And, um, so yes, their office was aware and they failed to take action because the conduct continued. We, my client was, uh, the conduct continued and no action was taken. And that fact, they became emboldened as you can see, as we go on. Um, could you talk about the retaliation? Because, um, I, I think that, um, the retaliation depends upon, um, is it Caglione? Yeah. On his testimony or, uh, right. Okay. Transfer to Syracuse. Okay. Transfer to Syracuse. I'm sorry. Go ahead. No, I'm sorry. I didn't interrupt you. No, that's, that's what I was focusing on because, uh, I think there were, there were other reasons given legitimate reasons for that, um, for that transfer, right? No, your honor. I don't think there were, and I'll tell you why. And Caglione was very clear about the transfer to Syracuse. He was on the call. He knew that this was done to get rid of Mull and get rid of Byrne from the, their group. And Caglione said clearly in the same group, right? I'm sorry. There were two other men who were also subject to the same transfer. Yeah. And Caglione said they were the sacrificial lambs. That's why he gave the heads up to them before Byrne and Mull even knew about it. Caglione was caught. He was in this company. He was afraid of losing his own job. He tried to do what he could. Well, we know what, I know what he said. I, I just wanted to make sure I understood that it wasn't just the two women. There were two other men who were affected as well. No, they were, but Finnegan, the one with 25 penis, he had a new job. Like the day after my clients were even told that they were going to be transferred. And Byrne did find another job at a higher pay with the company, but my client didn't. And Caglione was clearing. If you think of what they did by transferring them to Syracuse, they knew these women could not be there. They couldn't go. My client, that's a five hour round trip commute. That's a very long way. None of the cases cited by the defense include that. And in the Supreme court case, when they talk about what retaliation is, the court used an example, which I found very telling. What the Supreme court said is that a schedule change in an employee's work schedule may make little difference to many workers, but matter enormously to a young mother with school age children. Well, my client not only had school had, had young children. She was a mother with two young children. She had a disabled widowed mother that she helped care for. She was taking one. She was taking, trying to better herself and taking class. She had an evening class that she attended and she had a work, a work session for that she attended. I, it seems to me, I mean, I don't think this circuit has ever said basically that an increased commute is, uh, is an adverse employment action. We haven't said it isn't either. We haven't really ruled. I know the sixth circuit has, but I think in this case, what, what I was concerned about is it doesn't seem like there's much in the record to indicate that your client ever actually did go to Syracuse other than maybe once or twice, but that it doesn't seem like she was commuting there on a weekly or daily basis. Your honor. I, I don't think it's, it's not true that she was just pointing to where in the record I'm missing. Well, she said that, that, uh, Dixon would call her to make sure she's there. They said that she was told she'd have to be there. And Gaglione told her, look, if you have your meeting with clients on those days, you don't have to be there. There's no testimony that she wasn't there. In fact, what they did is they tried to tighten it more and more. So originally she's told that she has to be there. Now, interestingly, the purpose is because they want them all together. Yet the people in Syracuse, the ones that lived in Rochester are the ones that lived in the outskirts. They didn't have to be at the Syracuse office. The only people that were supposed to be there were her and chase and Gaglione said that. I mean, look again, I mean, you're, you're relying on Gaglione. He said she never really showed up in Syracuse very often at all. Well, what Gaglione said is that, and your client herself said that she couldn't recall the frequency that she went to Syracuse. What Gaglione says, he didn't pay attention to when she was there and encouraged her to schedule as many out of the office appointments as possible. But she was a rule follower and didn't heed his recommendation. So how many days was she there? I don't have the exact number of days. She doesn't say the exact number. Do you think it's in the record? You think that's in the record? The exact number of days? No. Do you think that there's anything indicating that it's more than five? Yes. I think that if you look at her affirmation, her declaration, she indicates that she went there the exact number. No, it's a question. It would be a question of fact. At the very least, she never said the exact number of days she was there, but no one ever said the exact number of days she wasn't there. I have a question about the relevance of whether she was there or not. Only on the basis of the fact is what we're focused on here, as I understand, is the retaliation motive. And if the retaliation motive was to try and get her to quit, because this was going to be impossible for her, she wanted to continue with the company. Yes. She had the kids at home. So it seems logical that she wouldn't want to go to Syracuse if she didn't have to. But I'm wondering how that really bears on the question of retaliation. In other words, they may have wanted to transfer and expected that that would cause her to quit. And that would be retaliation. But maybe they tried to retaliate and weren't successful in getting her to quit because she could find loopholes. Well, and what happened is Gaglione tried to help her. He was afraid for it, as he put it, I think it's a deposition or his affirmation, his declaration, affidavit. He tried to help her, but he was afraid of his own job. So they kept making sure she was there, trying to make sure she was there. And I think it's in her declaration where she says, Dixon would call her on the phone to see if she was there. He would, I have a note here, but I just don't have the page. Dixon would call Moll periodically to make sure she was in the Syracuse office. She did go to client accounts, et cetera. But it wasn't enough that she would be there a couple of days a week. What they wanted her to do then is they tightened it further and said, if you have a client in the morning, you have to go to Syracuse in the afternoon. If you have a client in the afternoon in Buffalo, you have to go to Syracuse. Then you have to drive out and meet your client. It just made no business sense. As Gaglione said, it doesn't make any logical business sense to do that. And they weren't doing it to anybody else who was reporting to Gaglione. And Gaglione said that. But he is a key witness because he was the SEM in Syracuse. He was the one there that knew what the people, the other people reporting in Syracuse that were not Moll and Chase were doing. And those requirements were not being made of them. And that is retaliatory. OK, you've reserved a couple of minutes for rebuttal. Let's hear from Mr. Urban. Thank you, Your Honor. Good morning. I also urge the panel with respect to the hostile work environment claim to look at the fatality of the circumstances. And I think if you look at the complete record, no reasonable fact finder could determine that this was a work environment hostile on the basis of gender. This was an individual who was high school educated. The very people in this department who she claims were so hostile to her, pulled her out of a bargaining unit, gave her a salaried position. Within the principal years when she claimed she was being subjected to harassment, they increased her salary by 25 percent over that period of time. As the record indicates, during that same period, she was caught  never disclosing, never alerting the company. And when the company caught it in an audit. Why is it inconsistent with a hostile work environment to give a person raises as they normally occur? If, in fact, the hostile work environment is something other than discrimination on the basis of pay, which I think is really questionable here, whether there was discrimination on the basis of pay. But the litany of actions, I'm not talking about other people and third parties, but I'm just talking about her history with Irving and why that doesn't raise at least a question of fact as to whether that could create a hostile work environment as a matter of objective reasonableness. Sure, your honor. Well, let's talk about Mr. Irving. I think one thing to keep in mind about Mr. Irving is there was a two year period, 2001 and 2002, when he was her manager. And prior to that and after that, they were peers. So prior to that, 1999, 2000 was when they were co-workers. It was during that period when she contends that he repeatedly called her on one particular night when they were away for training. And also made comments. And the record is clear. We pasted her deposition testimony right into our brief, as I'm sure the court saw. She never complained about that. She never raised it with anyone. And then she starts reporting to Irving. And it was Irving who, when she was potentially facing discipline up to and including termination, for not reporting to the company that $10,000, it was he who intervened and convinced the more senior manager to allow her to repay that amount over time and not take any disciplinary action against her. I don't know how. That's a fact in your favor. But there are other facts that seem to be in her favor. The idea of forcing her to be alone, the shower communication, the fact that she was supposed to personally see him when she had any difficulties, all of that. And, you know, whether anything that happened before, it would seem to me, might be relevant in terms of what happened during the period of his supervision.  I just, seems to me that there's, this is, we're not the final decider in this case, right? It's supposed to go to a jury if there's a question. And often a hostile work environment is very hard to judge. If you're a judge, you could certainly decide if there's no evidence of a hostile work environment. If there's, if it's skimpy, like one thing or two things happened over a rather extended period of time. But this has a different feel to it, at least in terms of whether or not it should go to a jury. Your Honor, if I may, I think it's important to note that between discovery, before the first time we were up to this Court of Appeals, and then the two-year discovery period that the parties had thereafter, you have a greatly fully developed record. And it's our belief that the facts are not... Maybe it's both sides stipulating that we can just decide the case, you know, without having to go before a separate trier of fact? The material facts that, Your Honor, we're relying on, for the most part, come right out of the plaintiff's mouth. We cite to her deposition testimony. She complains about not being able to use hockey tickets, but it was her who admitted that these were tickets that were purchased by individuals in her office. They weren't the company's tickets. She complains about being obligated to go speak with Mr. Irving individually, in person, if she had an issue related to work. But she also admits that he... I'm not raised by your adversary, but I'm focusing on her relationship with Irving in the workplace, and whether that could, to a reasonable jury, create a hostile work environment. We don't think it can, Your Honor, simply because of the Harris standard. We think the facts are not in dispute. It's a lengthy, fully developed record, and we believe the district court properly could and did apply a lot of the facts, and enroll in her summary judgment in Verizon's favor on that. What about the transfer to Syracuse and Caglioni's testimony on that score? This is another example, in our view, Your Honor, of one of her immediate managers treating her favorably. You had a more senior manager who wanted to hand down this edict where four people were going to move to Syracuse. And as Judge Scretany of the district court pointed out, Caglioni intervened and came up with his own plan. And his own plan, which is supported by the record, it's not in dispute, both from Caglioni's post-remand testimony, as well as Ms. Mull's post-remand testimony, that she never really went to Syracuse because he wasn't going to enforce that transfer. So she didn't go. Mr. Chase, one of the other individuals who didn't go. And it was on that basis that Judge Scretany determined, and we agree, that she did not suffer a materially adverse employment action. She never went. That no jury could reasonably find that she suffered a materially adverse fact, employment situation. I mean, there is testimony that, as I understand it, I'm impressing them wrong. Caglioni saying that the primary actor for the transfer decision was, factor for the transfer decision was an effort to retaliate, I guess, both Ms. Mull and Ms. Byrne for their continuing complaints of discrimination and retaliation. Now, if that, could a jury believe that is the question? And if so, then it seems to me it's a jury question, unless there's some reason why that would not be introduced. When we were back before the district court after remand, one of the prudent decisions that Judge Scretany made was to have us go and re-depose Caglioni, clear up exactly what his testimony was and mail it down. And what he made clear as to that point, Your Honor, was that it was his opinion that this was Mr. Dixon's motivation. That was how he perceived it. He also said that Mr. Dixon had laid out what he believed in Dixon's mind was a good business plan. Caglioni disagreed with it. And that was why he came up with his own plan, as Judge Scretany noted, and did not make anyone go to Syracuse. What Ms. Mull actually did was, at Caglioni's direction, make sure she had appointments in Buffalo. And she never went to Syracuse. What do you mean she never went to Syracuse? I mean, what's your basis for saying that? In other words, she couldn't recall specifically when she was in Syracuse. There's no data I've seen to indicate, nothing on the record to indicate a calendar or anything like that. But what's your basis for saying she never went to Syracuse? The basis, Your Honor, is the question that I asked her on post remand when I deposed her. She said, I can't tell you specifically when I was in Syracuse or when I was in Buffalo. I set my own appointments. I was a salesperson. I was supposed to be out with the customers, and that's what I did. And then I asked her, you were present for Mr. Caglioni's post remand deposition testimony. Did you agree with anything he said about how often you came to Syracuse? She danced around the question. She said, I came to Syracuse when I didn't have appointments in Buffalo. I said, okay, what does that mean, Ms. Mull? She said that whenever I had an appointment in Buffalo, I wasn't reporting to the Syracuse office. And I said, and so would you make sure you had appointments scheduled in Buffalo? And she said, I would. That's not inconsistent with the fact that if she didn't have appointments, she might be in Syracuse. A minute ago, you said she was never in Syracuse, just flatly to us. But you don't have a basis necessarily for making that flat statement, do you? Well, there's nothing in the record indicating- You never said I never went to Syracuse. Well, your honor, I went, when I read the poster post remand, I went to great lengths to give her the opportunity to nail down how often she went to Syracuse, if at all. And she was unable to do so. And I asked her point blank that question and back and forth, I just read to you. And I said, so you would make sure you had appointments in Buffalo? She said, I would. What Gaglione said is that she never really showed up in Syracuse very often at all. It was never really a hardship for her at all because she never really did it. And the truth is I covered for her a lot in not doing it. That's what he said, right? That's true. But I mean, what I saw on the record is something to indicate that in May of 2005, she went to Syracuse once. You disagree with that? I don't disagree with that, Your Honor. She may have gone to Syracuse. Now, the other thing to keep in mind about the whole Syracuse question is again, what we discovered and when we were in discovery was that she was in this accelerated degree program outside of work that had certain obligations, study group, as well as class. And she was in that program when she was supposed to be reporting to Syracuse and claims that she was. And there's no way that she was reporting to Syracuse and going to college and working full time all at the same time, I would suggest to you. That raises the other point about the transfer to Syracuse being at least in the initial conception of it, being a two and a half hour commute each way, which would be very difficult for a person with small children, five hours commute. I mean, I know we haven't, we've said that commuting is not really relevant into these circumstances, but this is an extraordinary commute. This is a commute. It's like a commute from New York down to Wilmington, Delaware or someplace. Well, Your Honor, I would point out and as Judge Scrutony recognized in his decision below that she was given three options. One was as Ms. Byrne did, as well as Michael Finnegan did to transfer to another job at Buffalo. The other option was she could have accepted a severance package. She chose to stay in the work group and indicated she was going to work out of Syracuse, which again, we don't believe she ever did. So I think it's important to keep in mind that she was presented options as opposed to an edict. And secondly, the fact that she chose to remain in the work group, again, this environment that she claims had been so hostile to her over the years, read into that what you would, but to me, it suggests that even for her, subjectively, it wasn't a hostile work environment. Why would she stay if it was? Right. And a jury might agree with that. All right. Thank you, Mr. Urban. We've gone over a bit. Thank you, Your Honor. We'll now hear from Ms. Greco for two minutes. I think you're still on mute, Ms. Greco. First, I want to apologize for moving from the screen. I'd received a call from the Second Circuit and I was concerned it had to do with electronics. In fact, it was on something else, but my office put it immediately through. And I didn't want to be disrespectful to anyone. Your Honor, where'd it go? What? Sorry, it disappeared for a minute. Your Honor, first, with regard to her being on disability and allegedly taking money, there was a counterclaim in this case and a postal council lost it and did not appeal. And Ms. Maul didn't engage in fraud with regard to getting money when she was off work on pregnancy. Her husband did the bills during that time. She had two small children, an infant and a small child. As soon as she found out, she made arrangements and paid it back. With regard to an adverse action of going to work, Ms. Maul was required to be there. And you can tell by the continuing tightening up of what they did to her. First, they said, you have to be there when you don't have appointments. Then they said, oh, you have to be there if it's a morning appointment. Imagine that. You have a Buffalo morning appointment and it gets done at 11. You're going to drive two and a half hours to Syracuse to go to Syracuse and drive two and a half hours a night. While the people that are in Syracuse, the same thing, the SEs in Syracuse who might live in Rochester, they don't have to be there. These were specific rules that were made and they were retaliatory rules. And then at the end, he said, you have to be there three days a week. That's what Dixon said. You have to be there 24 hours, three full days a week. That's inconsistent with what an SEM is supposed to do. Not an SE, an SE is supposed to do, they're supposed to go to clients. And the whole point is they moved her from Buffalo where the cams were to Syracuse. And I think that Gaglione went through clearly showing how it didn't make any sense of a legitimate business purpose. I'd like to just touch on a couple more things. The judge with regard to the transfer to Syracuse said that it was that because Chase was there, because Chase was being checked up on, then therefore also it meant that it wasn't just based on mall. Chase was a sacrificial lamb. I mean, if everybody could get immunity by, if every employer could get immunity by picking another employee of the opposite sex and letting something happen to them, then there's no way to stop it. This is an example of a case where we have fought for so long and you can see the conduct. When we come to the termination, I'd like to just hit on that briefly, Your Honor. The judge said that there was no protective activity for a period of three years before the termination. It's just not true. In fact, she complained to Whitty. She complained that because he wanted her to go from the Buffalo office to the Amherst office, she complained that Dixon,  to Dixon and to Irving. And also that she was not getting assigned a CAM to work with. And that's what an SE is supposed to do. So what happened, she had been back from disability since March of 2006. From March of 2006 to September of 2006, six months, they could not assign her to a CAM or they couldn't, that's a corporate account manager, or they couldn't either as a primary or as a secondary. And that's how you're assigned. The only people assigned to those were men. And some of them, Sheldon, he was assigned three different CAMs. He was assigned as the Brogan's primary CAM. He was assigned as a secondary CAM for Winger and Marquis. And then they argue, oh, she was assigned to the prestigious M&T account. She wasn't assigned to it. In fact, they couldn't fix the problems. And the corporate account manager who makes his money from these accounts knew he was gonna lose the M&T account because the person that headed that account was furious that it couldn't be fixed. There were a lot of problems. So the corporate account manager took it on his own to contact Moll to see if she could help them. And she did, and she went in and fixed it. And the result was the head of the M&T account and telecommunications wanted Moll assigned full-time to their account. That would be as the primary, you know, SE. And although they testified, Whitty testified that normally they try to do what a huge client like that wants, they refused to assign her. All right. And then they say there's no discrimination. Ms. Greco, you're about three minutes over your rebuttal. So we're gonna have to cut it there. We've got the briefs. We've got the argument. We will reserve decision. Thank you both. Thank you, your honors. We'll now move- Thank you, your honor.